(No. 80-CC-043█

AMERICAN BANK OF CERRO GORDO, Guardian of the Estate of Gene Ray Fickes, a minor, and BARBARA KEITH, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed July 27, 1984.*

DAVID A. DVORAK, for Claimants.

NEIL F. HARTIGAN, Attorney General (SUE MUELLER, Assistant Attorney General, of counsel), for Respondent.

ROE, C.J.

This claim has been brought by American Bank of Cerro Gordo as guardian of the estate of Gene Ray Fickes, a minor, and by Barbara Keith, the mother of the minor, to recover for injuries inflicted upon the minor by Carrie Reed, a foster parent licensed by the Illinois Department of Children and Family Services (DCFS).

Gene Ray Fickes, the minor, was born October 20, 1977, of Claimant Barbara Keith and Raymond E. Fickes. The child resided in Decatur with his parents, who were not married. Kimberly, Barbara Keith's four-year-old daughter, also resided in the home.

In early 1978, the household was referred by DCFS to the Youth Advocate Program in Decatur because of the need of the family for help in caring for the two children. Barbara Keith and Raymond Fickes had a history of heavy drinking and fighting with each other to the extent that physical injury was inflicted upon one or the other. There is no evidence, however, that either child was ever physically abused. Both parents admitted in their testimony that they suffered from alcoholism.

On May 28, 1978, Barbara Keith contacted the Youth Advocate Program and requested that Gene Ray be placed in a foster home because the parents had been drinking heavily and were afraid they could injure the child. Kimberly had already been taken from the home by Barbara and Raymond to reside with Doris Fickes, Raymond's mother. Eleanor Bridgman, the caseworker for this family, went to the home, took physical custody of the child and placed the child in a foster home for shelter care until DCFS could make a more long-term placement. DCFS then filed proceedings for involuntary surrender, and on May 31 the Circuit Court of Macon County held a shelter care hearing pursuant to section

3—6 of the Juvenile Court Act (Ill. Rev. Stat., ch. 37, par. 703—6). On that date the court found that the child needed immediate protection and should be detained in shelter care. DCFS was appointed temporary guardian with authority to place the child in a "licensed foster home until further order of court." An adjudicatory hearing was set for June 30, 1978.

On June 28, 1978, Mrs. Keith was found to be indigent, and Jessica Stricklin was appointed as her counsel in the juvenile proceedings.

On July 24, 1978, the circuit court placed the minor into custody of Larry and Carrie Reed, who resided in Blue Mound, Illinois. Mr. and Mrs. Reed had been licensed by DCFS on May 29, 1978, to serve as foster parents for children between the ages of two years and 18 years. At the time of the court order, the minor was just nine months old. In fact, the minor had been placed with the Reeds on June 5, 1978.

In August 1978 the minor suffered a broken leg. Mrs. Reed reported he had fallen and DCFS found no reason to suspect otherwise.

In the meantime, because of persistent complaints by Mrs. Keith that the child was not being properly cared for by the Reeds, Jessica Stricklin, the child's guardian *ad litem*, filed a petition to return the child to his natural mother, who was now separated from the child's father. On September 14, 1978, the court authorized DCFS to place the child back with his mother, subject to DCFS supervision, and further entered an order of protection against the father.

In October, while the child's return was being processed, the child was sick for an extended period of time. Claimants allege that the illnesses were caused by

the negligence of DCFS and Carrie Reed. The child, however, was not taken out of the foster home until November 8, 1978, because of various bureaucratic delays in DCFS proceedings. On November 8, the day before DCFS was scheduled to remove the child, the foster mother, Carrie Reed, seriously injured the child by slamming his head against the floor, causing severe internal head injuries to the child. When the DCFS worker, Adelaide Price, picked up the child the next day, she noticed that the child was not responsive. She immediately took the baby to the DCFS office in Decatur, from where the child was rushed to Decatur Memorial Hospital. At the hospital it was determined the child had been badly abused. Carrie Reed was subsequently arrested for child abuse. She confessed to a series of acts, including choking the baby, sexually molesting the baby, breaking the baby's leg in August and smashing the baby's head on November 8. She pleaded guilty to child abuse and was sentenced. Claimants allege that the State is liable in damages for the injuries suffered by Gene Ray Fickes.

The first theory proposed by the Claimants is that the Court of Claims Act makes the State liable for the torts of its officers, agents or employees.

Section 8(d) of the Court of Claims Act (Ill. Rev. Stat. 1979, ch. 37, par. 439.8(d)) provides:

"The Court of Claims shall have exclusive jurisdiction to hear and determine the following matters . . . (d) All claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit . . ."

The question therefore is whether a private corporation would be liable for similar acts by its agents.

Under the laws of the State of Illinois, a principal is liable for torts which are wilfully, wantonly, or maliciously committed by an agent acting under the

authority or direction of the principal. Where, however, the agent abandons the business of the agency and commits an act outside the scope of his authority or employment in a wanton, wilful, or malicious manner, the principal is not liable therefor. *Kokenes v. Cities Service Oil Co.* (1974), 24 Ill. App. 3d 483, 321 N.E.2d 338.

In this case there is no question that Carrie Reed was not acting under the direction of DCFS. In fact, she was acting completely contrary to the purpose for which she was employed. Therefore, the Respondent is not liable for the actions of Carrie Reed under an agency theory.

Claimant's next theory of liability is that the State was negligent in its supervision of Carrie Reed. Section 2 of the Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1977, ch. 23, par. 2052) provides:

"The Illinois Department of Children and Family Services shall, upon receiving reports made under this Act, protect the best interests of the child, offer protective services in order to prevent any further harm to the child and to other children in the family, stabilize the home environment and preserve family life whenever possible. Recognizing that children can also be abused and neglected while living in public or private residential agencies or institutions meant to serve them, this Act also provides for the reporting and investigation of child abuse and neglect in such instances."

Furthermore, section 5 of the act creating DCFS (Ill. Rev. Stat. 1977, ch. 23, par. 5005) provides that DCFS shall provide direct child welfare services by

"(1) preventing or remedying or assisting in the solution of problems which may result in the neglect, abuse, or exploitation of children; . . . and (4) providing adequate care of children away from their homes, where needed, in foster family homes or day care or other child care facilities."

The State therefore has an affirmative duty to investigate complaints made about foster parents such as Carrie Reed and to supervise the foster home. The State contends that their agents and employees were not negligent in their supervision of this child and that they

took all reasonable precautions to safeguard and supervise the foster home.

Claimants' allegations regarding DCFS' negligent supervision of Carrie Reed are basically twofold. First, the Claimants allege that, although the real mother, the real father, the real grandmother and the child's guardian *ad litem* made repeated complaints that the baby was not being properly cared for, DCFS made no attempts to correct the problems. Second, the Claimants allege that an agent of the State admitted to the child's guardian *ad litem* that DCFS knew that Carrie Reed had made conflicting statements regarding the child's broken leg, but that DCFS did not make a thorough investigation regarding the discrepancy. We find that neither allegation is sufficiently supported by evidence of negligence.

Testimony by Barbara Keith and Jessica Stricklin substantiates the fact that repeated complaints were made to Standley Moore at DCFS. As a matter of fact, Barbara Keith and her mother can be characterized as chronic complainers. Barbara Keith and her mother complained repeatedly that the child was sick, that the child was dirty, that the child's bottles were dirty, that the child "looks like a little animal," that the child "doesn't laugh anymore," that the child was being mistreated, that the child was not receiving proper medical attention, that the foster parents bought the child too many nice things and that the child wasn't wearing the clothes that they had bought but rather he was wearing clothes that the foster parents had bought. Jessica Stricklin's complaints to Standley Moore were in substance just transmittals of Barbara Keith's complaints, except for the one occasion when Ms. Stricklin actually saw the child, at which time the child was apparently ill and was given some medical attention.

Standley Moore's response to these complaints was to send a "homemaker" or helper, Adelaide Price, to help Carrie Reed. Ms. Price's testimony indicates that, while Carrie Reed did have some minor problems in these areas, most of the complaints were greatly exaggerated. Carrie Reed was an adequate mother, at least while Ms. Price was present. Furthermore, Ms. Price testified that the baby did receive proper medical attention and that in at least one instance Carrie Reed took the baby to her family doctor after the natural mother had taken the baby to a different doctor, who had prescribed medicine too strong. Ms. Price further stated that, in the many instances in which she gave the baby a bath, she never once saw a bruise or abrasion on the baby's body.

Eleanor Bridgman, a caseworker supervisor with the Youth Advocate Program in Decatur, an agency working with Barbara Keith, corroborated Ms. Price's evaluation of Barbara Keith by testifying that she was with Barbara Keith on at least one occasion when Mrs. Keith complained about the baby receiving improper care from the foster mother even though the baby appeared to be clean, adequately dressed, and physically healthy. In light of this testimony it would appear that Standley Moore and DCFS did take reasonable steps to investigate and remedy the complaints.

The next allegation arises through the testimony of Jessica Stricklin, the child's guardian *ad litem*. According to Ms. Stricklin, Eleanor Bridgman admitted that DCFS knew Carrie Reed had given two different statements concerning the baby's broken leg but that DCFS did not investigate the discrepancy. Ms. Bridgman herself was never questioned on this point during her evidence deposition. The State objected to the

evidence on hearsay grounds. The commissioner sustained the objection but allowed an offer of proof. The question is whether the evidence should be allowed as an admission by an agent of the State. Before a statement can constitute an admission by an agent, it must be shown that the person was an agent or employee, that the statement was made about a matter over which the agent or employee had actual or apparent authority, and that the person spoke by virtue of his or her authority as an agent. (*Cornell v. Langford* (1982), 109 Ill. App. 3d 472, 440 N.E.2d 985; *Kapelski v. Alton & Southern Railroad* (1976), 36 Ill. App. 3d 37, 343 N.E.2d 207.) It is the opinion of this Court that Eleanor Bridgman does not meet these requirements. The testimony of Eleanor Bridgman was that she was a casework supervisor for the pre-teen program in Decatur. As such she was an employee of the State and did handle referrals from DCFS. She was, however, by her own testimony only responsible for situations in which the DCFS thinks the family needs extra help in order to maintain the children *at home*. While Eleanor Bridgman was instrumental in physically removing the child from the real parent's home, nothing in the record indicates that she held *any* authority over the care and supervision of the child once the child was removed from the real parents. Furthermore, nothing in the record indicates that Eleanor Bridgman ever had access to the files regarding the foster care of the child, nor is there anything in the record to indicate that Eleanor Bridgman had any advisory, supervisory, or investigatory powers concerning the foster parents or the protection of the child after the child was placed in the foster home. Eleanor Bridgman had no authority to make any statements regarding either the care provided by the foster parents or the DCFS investigations of that

case. Ms. Stricklin's testimony regarding the admission of Eleanor Bridgman is therefore excluded. Furthermore, the State has produced evidence that it did investigate the first accident and the illnesses and that as part of that report a Dr. Mathias reported to the DCFS that:

"I examined (Gene Ray Fickes) on 10/30/78. I did not find any evidence of physical or mental abuse to the child. He was alert and cooperative with the examination. He went to his foster mother willingly and without any sign of fear or hesitation.

. . . In summary I have known the foster father, Larry Reed, for 25 years and his wife, Carrie Ellen, for approximately 5 years, and know them to be God fearing Christians and are incapable of any form of child abuse or neglect."

The fact that Dr. Mathias may have been incorrect does not affect the fact that DCFS could reasonably rely on Dr. Mathias' professional judgment. We find that the allegations of negligent supervision are not substantiated by the evidence.

Claimants allege that the State was negligent in hiring Carrie Reed because they should have known she was not fit to be a foster parent, that the State compounded the negligent act by placing Gene Ray Fickes in her home, and that as a proximate result of the State's negligence Gene Ray Fickes suffered severe injuries. We agree with this allegation.

This Court held in *Schmidt v. State* (1976), 31 Ill. Ct. Cl. 446, that the State was liable for the acts of an unqualified doctor hired by the State. In *Schmidt*, the agent of the State, under the guise of being a qualified physician, gave a patient an over dose of medication. The unqualified physician was thereafter arrested and convicted of involuntary manslaughter and reckless conduct, and the estate instituted a civil suit against the State for damages. This Court awarded damages based

on the fact that the State was negligent in hiring an unqualified physician.

While it is much easier to ascertain whether a person is qualified to be a physician, this Court has recently allowed damages against the State under the same theory as the one proposed by the Claimants in this case. In *Carr v. State* (1979), 33 Ill. Ct. Cl. 128, this Court sustained an award of $90,000 to a ward of the State who suffered personal injuries as a result of being attacked by his foster father. The foster parent in that case, as in this case, was licensed by DCFS. The Court determined that DCFS had a duty to provide him with an adequately safe and healthy environment. Part of this duty included placing the ward in suitable foster homes under the care of competent foster parents. "Another aspect of this duty is the obligation to make reasonable efforts to determine whether a foster parent is capable and willing to properly care for a ward." *Carr, supra,* at 129.

We believe that the State failed to meet its duty to "make reasonable efforts to determine whether a foster parent is capable and willing to properly care for a ward" in this case. The State argues that its investigation was unreasonably hampered by Carrie Reed and that, because Carrie Reed lied about her past, they could not have reasonably determined her past psychiatric problems. While Carrie Reed did indeed lie to DCFS about her past history by characterizing her college days as happy, when in fact she had undergone psychiatric treatment for severe depression and attempted suicide, the DCFS' own files reflect negligence in the licensing of Carrie Reed.

According to the testimony of Mrs. Lucille Biggs, who is employed in the licensing division of DCFS, the Department requires an applicant to list three character

references. Two of the three character references must then write letters to DCFS on behalf of the applicant. DCFS sends out requests for the references to all three character references listed and two of the three must respond before an applicant can be accepted. In the case of the Reeds one of the three references did not respond, but Rev. Robert C. Clark and Mr. and Mrs. Skelton did respond.

Reverend Clark's letter stated that he had known Larry Reed for about 18 years, and he recommended Larry highly. On the other hand, Rev. Clark stated that he had known Carrie Reed for about five years and that he had "grave reservations" about her abilities. He states:

". . . I have grave reservations about (Carrie's) ability to function (as a foster parent). She is a scatter brain from the word go who has extreme difficulty comprehending the reality of a situation. I would characterize her as one who would tell jokes at a funeral. She would not be capable of reading a child's needs nor responding to them in a constructive manner and yet she would glorify to others the way she handles every situation properly. She has so much growing up to do that I see her needing a foster parent rather than being one.

I hate to think that Larry would have to be deprived of children in his home because of his wife but I simply could not recommend them for the placement of children due to her ineptness."

The State argues that one bad reference does not and should not mandate that the applicants be rejected. This may be correct, depending upon the nature and facts. One bad reference need not disqualify an applicant if DCFS is satisfied that the allegations in the recommendation are unfounded. This is not the case here. The record clearly shows that DCFS simply ignored the letter. Lucille Biggs admits that Rev. Clark was never contacted by DCFS despite the overwhelmingly negative comments in his letter.

The State argues that this letter must be balanced against the "positive" letter written by Mr. and Mrs. Skelton. The letter written by the Skeltons must be given

weight. However, the Skeltons' letter does not justify the fact that DCFS ignored Rev. Clark's letter. DCFS is responsible for the protection of the child. It therefore has a duty to thoroughly investigate potentially harmful situations. In this case it simply did not investigate Rev. Clark's allegations.

While the State argues that the letter written by Rev. Clark was only a portion of the total picture, a statement by Standley Moore puts the letter in better perspective. In his testimony Standley Moore stated that you must weigh the credibility of the person writing the character reference. The Court takes note of the fact that Rev. Clark had ample opportunity to observe the Reeds. Many of the Reeds' "charitable acts" listed on their DCFS application were done in conjunction with Rev. Clark's church. The Court also takes note of the nature of Rev. Clark's work and the nature of the letter—that is, this was not a standard reference letter but one that was unusually negative. Standley Moore apparently thought so, too, since in his testimony he stated very simply that he had never seen Rev. Clark's letter before, but that if he had he probably would have removed the child earlier than he did. That statement alone contradicts the State's dismissal of Rev. Clark's letter.

Furthermore, DCFS' only source of information on the applicants' background comes from either the applicants or from the references listed by the applicants. When an agency such as DCFS receives such a negative recommendation from the applicants' own choice of character references, that negative recommendation must be taken seriously. If such a recommendation is not adequately investigated, then the agency will be liable for damages arising out of the dangerous situation it has created.

Even the Skeltons' letter states that the Reeds have previously been unable to adopt children and that "(the Reeds) may have problems but we feel they would be able to handle them as parents." Yet the DCFS file shows no indication that these statements were ever investigated.

### Another DCFS memorandum states:

"Mrs. Parr was much less hesitant about her son-in-law than her daughter. She kept adding, when talking about her daughter, 'of course, I'm prejudiced.' So I don't know if she had reservations about her daughter or not. When I pushed her for a decision she would say 'I like to think she would made a good mother.' "

### Another DCFS memorandum states that

"A recurring theme we heard about (Carrie) was words like 'kooky' or 'nuts'. We tried to track the meaning of these words down. What the licensing worker and I could determine is that these are affectionate terms for her peppiness and some of her ways that in transactional analysis terms could be said 'the child in her coming out'."

### Yet the same memorandum warns that

"we also need to watch if (Carrie) is 'scatterbrained' or if her flitty ways are just some child fun coming out of her."

It is obvious that the licensing department of DCFS had reservations about Mrs. Reed. The State's answer to the question of why these reservations weren't alleviated before the Reeds were granted a license is exemplified by the testimony of Lucille Biggs, an employee of DCFS in the licensing department. At trial the following exchange took place between Claimants' counsel and Lucille Biggs:

"Q. At the time the Reeds were approved for foster care, the department didn't have a lot of foster families available for foster care, did they?

A. The department never has a lot of foster homes.

Q. I assume that had something to do with using the Reeds as a foster home in this case.

A. I can't address myself to the using of the Reeds in this case. During the course of the study in the final decision we did not feel that we had enough information to deny the Reeds a license."

.

In the opinion of this Court, such an attitude is inconsistent with the minimum standards for licensing foster homes. According to Children and Family Services Regulation 5.12, section 2, subchapter IIB, *Personal Characteristics for Foster Parents*, the "foster parents should be stable, responsible, mature individuals, who can exercise good judgment in caring for children . . ." Furthermore, subchapter VA states:

"The adoptive home study shall be done with sensitivity and professional competence. The study of an adoptive home shall indicate a thorough knowledge of the adoptive couple and the adoptive family unit. There shall be ample evidence that the adoptive family can be reasonably expected to offer an adoptive child full opportunity for his potential individual growth and development."

It is the duty of the DCFS to make a thorough investigation in order to provide ample evidence that the proposed foster parent is in fact capable. Lucille Biggs' testimony indicates that contrary to the statute and regulations, DCFS took the attitude that if it did not have ample evidence of immaturity and instability, it would license the applicant. It is precisely this attitude which led to DCFS' failure to make adequate investigations to uncover Carrie Reed's prior mental health problems. As such, we find that DCFS was negligent in its duty to Gene Ray Fickes, and that the negligence of DCFS was a proximate cause of the injuries of Gene Ray Fickes.

Before turning to the question of damages, it is necessary to address one other theory of liability by Claimants—namely, that Respondent is liable for damages because DCFS violated its own regulations in placing a child younger than two years of age in a home licensed for children two years of age and older. Testimony by Lucille Biggs indicated that such age requirements were only to indicate the previous parental skills of the foster parent and not to indicate reservations

about the character or mental stability of the parent. This being true, we find that such a mistake was not the proximate cause of Claimants' injuries. The Court does take note of the fact, however, that this was another indication of the lack of following thorough procedures by DCFS.

Dr. Campion, a licensed psychologist engaged in the practice of clinical psychology, testified that traumatic injury to a child of Gene Ray Fickes' age can have severe impact on the child's development. Signs of bedwetting, violence, aggression, hyperactivity, anger and severe social difficulties manifest themselves. This effect can last indefinitely without treatment, and even treatment is not always successful.

Dr. Campion examined Gene Ray Fickes and determined that his behavior was abnormal. He had some head-banging behavior which indicates stress in a child. He also had indications of hyperactivity and aggressive and violent behavior. The child had difficulty in social situations and in sharing and receiving love. He also states that the child was beginning to show signs of what can be termed psychopathic behavior and, unless treatment is successful, Gene Ray could have permanent emotional problems. Dr. Campion felt that, based on the child's background, he would need at least $20,000 worth of therapy and the longer the child waited, the less likelihood there was of success. Given the nature of the injuries, including the child's pain and suffering, and given the possibility of a long and extended therapy with permanent emotional scars, we find that an award in the amount of $100,000.00, the maximum amount that can be awarded by this Court in a case sounding in tort, should be granted in this case. This amount should be placed in trust for the minor with the American Bank of

Cerro Gordo, guardian of the minor, for the benefit of Gene Ray Fickes.

Claimant Barbara Keith has also requested an award for damages for her severe emotional distress resulting from the various acts of alleged negligence and liability which caused the serious injuries to her son. However, there is no evidence whatsoever that Barbara Keith is entitled to damages for mental distress, since she did not herself suffer any "contemporaneous impact" (*Carlinville National Bank v. Rhoads* (1978), 63 Ill. App. 3d 502, 380 N.E.2d 63; *Bullard v. Barnes* (1983), 112 Ill. App. 3d 384, 445 N.E.2d 485) nor was she within the "zone of physical danger," as recently defined by the Illinois Supreme Court (*Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 457 N.E.2d 1). Therefore we find that the claim of Barbara Keith must be denied.

For the reasons set forth hereinabove, it is hereby ordered that the sum of $100,000.00 be, and hereby is, awarded, in full and final satisfaction of this cause of action, to the American Bank of Cerro Gordo, guardian of Gene Ray Fickes, for the benefit of Gene Ray Fickes, a minor.